[Cite as *State v. Stewart*, 2024-Ohio-1448.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

      Plaintiff-Appellee, :

                                No. 23AP-203

v. : (C.P.C. No. 22CR-1978)

Jonathan N. Stewart, : (REGULAR CALENDAR)

      Defendant-Appellant. :

---

D E C I S I O N

Rendered on April 16, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Taylor Mick*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Jonathan N. Stewart, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to a jury verdict finding him guilty of felonious assault, in violation of R.C. 2903.11, a second-degree felony, and guilty as to the related firearm specification. For the reasons that follow, we affirm.

## I.  Facts and Procedural History

{¶ 2} On May 5, 2022, appellant was indicted on one count of felonious assault, in violation of R.C. 2903.11, a second-degree felony, with a three-year firearm specification. The indictment alleged the foregoing offenses occurred on or about March 22, 2022, when appellant knowingly caused serious physical harm to Tizonna L. Stewart, and/or did knowingly cause or attempt to cause serious physical harm to her, by means of a deadly

weapon or dangerous ordnance, to wit a firearm. Appellant entered a not guilty plea to the charges and requested a jury trial. On January 9, 2023, a jury trial commenced. At trial, the following evidence was adduced.

{¶ 3} B.T. testified that on March 22, 2022, she was working as a cashier at the Sunoco gas station located at 7700 Kennedy Road in Franklin County, Ohio ("the Sunoco"). Sometime after 9:00 p.m., she took her break and went outside. While she was talking to her ex-boyfriend on her phone, she heard what sounded like gunshots and looked up. Before she ran back inside the store, she observed one vehicle pulling out of the parking lot and another vehicle chasing behind it. She testified that both vehicles had been parked near the dumpsters before pulling out of the parking lot. She further testified that it was dark outside and so she was unable to observe many details about the vehicles or their drivers; however, she saw a tan vehicle pull up just before the shooting, and that same tan vehicle was the vehicle chasing the other vehicle out of the parking lot. When the police arrived, B.T. gave them a statement. The police also collected security footage from the Sunoco's surveillance cameras, which B.T. confirmed faced the parking lot and the fuel pumps.

{¶ 4} Daniel Melton, a 911 dispatcher for the city of Columbus, testified that on March 22, 2022 he was working in his capacity as a 911 dispatcher. At approximately 9:30 p.m. that evening, he received a call from a female—later identified as Tizonna Stewart—who reported she had been shot at the Sunoco. The state admitted a recording of the 911 call, which was approximately seven minutes long, into evidence. During the call, Ms. Stewart reported she was fleeing in her vehicle because she was being chased by the shooter. Mr. Melton attempted to track Ms. Stewart's location and guide her to a well-populated area where she could safely meet first responders. During the course of the 911 call, Ms. Stewart reported she was driving near Mount Carmel East Hospital before driving into Whitehall. Ms. Stewart eventually told Mr. Melton she had been able to lose the shooter somewhere near East Broad Street and Yearling Road. Ms. Stewart made contact with police officers at the intersection of Main Street and James Road, whereupon the 911 call ended.

{¶ 5} Officer Tyler Hicks with the Columbus Police Department ("CPD") was on duty at the time Daniel Melton received the 911 call from Ms. Stewart. Officer Hicks heard the dispatch call over the radio for a shooting reported nearby. The dispatcher informed

officers that the female victim had reported that her husband—later identified as appellant[1]—had shot her. Officer Hicks turned on his body worn camera ("BWC") as he responded to the shooting, and the BWC footage was introduced and admitted into evidence as state's exhibit E.

{¶ 6} Officer Hicks testified that the dispatcher reported that Ms. Stewart was driving a silver Lexus, and the male suspect was driving a gold Cadillac. The dispatched also informed officers that there had been another call earlier that same day involving two vehicles that matched the same description. Another officer, Officer South, had responded to the earlier incident. Officer South responded over the radio that the earlier incident had involved a dispute during which appellant allegedly shot at Ms. Stewart. However, Ms. Stewart refused to cooperate with Officer South when he responded to the earlier call, so he was unable to provide further information. Officer Hicks was already familiar with appellant and Ms. Stewart because during the earlier incident Officer South had called Officer Hicks to ask his advice on options for proceeding without the cooperation of Ms. Stewart.

{¶ 7} Officer Hicks further testified that the dispatcher kept the responding officers updated on Ms. Stewart's location, beginning at the Sunoco and continuing eastbound past Mount Carmel East. Officer Hicks, along with a new officer riding along for training purposes, eventually encountered Ms. Stewart near the intersection of Main Street and James Road. Ms. Stewart was outside of her vehicle and waving her arms frantically to flag down the officers. She had a large, blood stain on her sweatshirt, and he could see there had been "quite a bit of blood loss." (Jan. 10, 2023 Tr. Vol. II at 75.) Officer Hicks cut off the sweatshirt and applied a tourniquet until medics could arrive at the scene.

{¶ 8} Officer Hicks testified that Ms. Stewart initially told him that she knew who had shot her and knows all of his information, but she did not want to talk about it until she felt safe. She told Officer Hicks that she was shot at the Sunoco and that there should be cameras. Once the medics arrived at the scene and they were loading Ms. Stewart into the ambulance for transport to the hospital, Officer Hicks asked her for the shooter's name. Ms. Stewart provided appellant's full name and his date of birth.

---

[1] Appellant and Ms. Stewart's marriage certificate was admitted into evidence by stipulation. (*See* State's Ex. B.)

{¶ 9} Sarah Wagner, a firefighter and paramedic with the Columbus Fire Department, provided emergency care to Ms. Stewart during her transport to Mount Carmel East Hospital. Ms. Wagner provided testimony which indicated Ms. Stewart had been shot in her arm/shoulder and in her right upper chest and her run report corroborated same. Ms. Stewart was alert, oriented, and able to communicate during the transport. Ms. Wagner testified that during the transport, Ms. Stewart reported she had been shot by her husband (appellant).

{¶ 10} Officer Hicks followed the ambulance to the hospital and remained with Ms. Stewart throughout the night. Angela Nelson, a trauma nurse, collected Ms. Stewart's clothing and provided it to Officer Hicks. During the course of treatment provided to Ms. Stewart, a projectile from a bullet was extracted from her right breast. Officer Hicks collected the projectile after it was extracted. While he was still at the hospital, Officer Hicks called the Whitehall Police Department ("Whitehall PD") to ask whether they had any "Flock" camera surveillance footage that might be relevant to the investigation.

{¶ 11} Lieutenant Bryan Smith, a Whitehall PD officer, testified that he was working in his capacity as a supervisor on March 22, 2022. Lieutenant Smith testified that Whitehall PD had recently hired a third-party contractor named "Flock Safety" to install surveillance cameras at various intersections throughout the city of Whitehall. Lieutenant Smith explained that a "Flock" camera takes a photograph of every vehicle that passes through a given camera's intersection throughout the course of the day. Lieutenant Smith received a request to search the Flock database for any images of the make and model of appellant's car, as well as its license plate, to determine whether any cameras had captured a photograph of the suspect vehicle in the area around the time of the shooting. Lieutenant Smith found a photograph of appellant's car taken by camera No. 16, located at the intersection of East Main Street and Maplewood Avenue. He emailed the photograph to Officer Hicks. The car was registered to "Jonathan Stewart" (appellant). Officer Hicks found Ms. Stewart approximately 5 blocks away from camera No. 16.

{¶ 12} Detective Jeffrey Cromwell of the CPD testified he was assigned to the investigation the night of the shooting. At that time, he was working in the domestic violence unit. Detective Cromwell first went to the hospital to interview and photograph Ms. Stewart. He then went to the Sunoco to collect evidence and photograph the scene. At

the scene, Detective Cromwell observed and photographed shattered glass in the parking lot near the dumpsters. He also photographed and collected a shell casing found in the same area. However, a gun was never recovered, so ballistics testing could not be conducted to match the shell casing to a specific weapon.

{¶ 13} After finishing his investigation at the Sunoco, Detective Cromwell reported to the intersection of Main Street and James Road, where a grey Lexus with license plate HJN **** registered to Tizonna L. Stewart was being guarded by another CPD officer. The vehicle's front passenger window had been shot out and there was glass inside the vehicle. Detective Cromwell photographed the vehicle and the clothing left behind after Officer Hicks had cut it off Ms. Stewart.

{¶ 14} The state concluded its presentation of evidence by presenting the testimony and reports of two forensic nurses who had treated Ms. Stewart at Mount Carmel East Hospital. Angela Nelson testified that she treated Ms. Stewart upon her arrival, took photographs of Ms. Stewart's injuries, and consoled Ms. Stewart as the bullet projectile was removed from her chest.

{¶ 15} Finally, Julie Foor testified she had cared for Ms. Stewart after Ms. Nelson's shift had ended. Ms. Foor took a full history and report from Ms. Stewart. During the course of taking this history and report, Ms. Stewart identified appellant as the person who shot her. Ms. Foor testified that Ms. Stewart told her that appellant had attacked her and strangled her earlier that day, stating that Ms. Stewart told her that "he choked me in the a.m. about 8:00 a.m." and "he shot me in the evening." (Jan. 11, 2023 Tr. Vol. III at 78-80.) The state then rested its case, and defendant-appellant likewise rested without calling any additional witnesses.

{¶ 16} At the close of the state's case, outside of the presence of the jury, defense counsel moved for acquittal pursuant to Crim.R. 29. (Tr. Vol. III at 117-20.) The trial court denied the motion. *Id.* at 128. Subsequently, at the close of the defense's case, again outside of the presence of the jury, defense counsel renewed his motion for acquittal based on Crim.R. 29. *Id.* at 153. The trial court again denied the motion. *Id.* at 154.

{¶ 17} At the conclusion of the trial, the jury returned a verdict finding appellant guilty of felonious assault, in violation of R.C. 2903.11, a second-degree felony, and guilty as to the firearm specification. On January 12, 2023, appellant was informed of the jury's

verdicts in open court, and the court ordered a presentence investigation. On February 23, 2023, a sentencing hearing was held pursuant to R.C. 2929.19, and on February 28, 2023 the trial court issued a judgment entry which reflected the verdict of the jury and imposed a sentence of 11 years in prison with an indefinite sentence of up to 15 years.

{¶ 18} This timely appeal followed.

## II. Assignments of Error

{¶ 19} Appellant asserts the following two assignments of error for our review:

[I.] The trial court erred when it denied Jonathan Stewart's Rule 29 Motion for Acquittal.

[II.] The verdicts of guilt as to all three counts were against the manifest weight of the evidence.

(Sic passim.)

## III. Discussion

### A. First and Second Assignments of Error–Motion for Acquittal (Sufficiency of the Evidence) and Manifest Weight of the Evidence

{¶ 20} Appellant's two assignments of error are interrelated in that they challenge both the sufficiency and weight of the evidence, and we therefore address them together. In his first assignment of error, appellant argues that the trial court erred when it denied his motion for acquittal. In his second assignment of error, appellant argues that the verdict was against the manifest weight of the evidence. We find no merit in either of appellant's contentions.

{¶ 21} Crim.R. 29(A) provides, in relevant part, "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Crim.R. 29(A). "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether a conviction is supported by legally sufficient evidence is a question of law. *State v. Flood*, 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 16, citing *Thompkins* at 386.

{¶ 22}    In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  In conducting a review of the sufficiency of the evidence, " 'an appellate court does not engage in a determination of witness credibility; rather it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.' " *Flood* at ¶ 16, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4, citing *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 16.

{¶ 23} Comparatively, "[w]hile sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386.  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  This discretionary authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 24} Furthermore, " '[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistences do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Gullick*, 10th Dist. No. 13AP-317, 2014-Ohio-1642, ¶ 10, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996).  "A jury, as the finder of fact and the sole judge of the weight

of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony." *Id.*, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 25} A conviction is not against the manifest weight of the evidence simply because the jury believed the state's version of events over the appellant's version. *Gullick* at ¶ 11, citing *State v. Houston*, 10th Dist. No. 04AP-875, 2005-Ohio-4249, ¶ 38 (reversed and remanded in part on other grounds). Rather, a reviewing court must give great deference to the jury's determination of witness credibility. *Id.*, citing *State v. Chandler*, 10th Dist. No. 05AP-415, 2006-Ohio-2070, ¶ 19. This is so because the jury " ' "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *State v. Huber*, 10th Dist. No. 18AP-668, 2019-Ohio-1862, ¶ 32, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 26} Appellant challenges his conviction on the count of felonious assault, in violation of R.C. 2903.11. R.C. 2903.11 provides, in relevant part:

> (A) No person shall knowingly do either of the following:
>
> (1) Cause serious physical harm to another or to another's unborn;
>
> (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

R.C. 2903.11(A)(1) and (2). In turn, "serious physical harm" is defined as:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a) through (e).

{¶ 27} In his challenge to the sufficiency of the evidence, appellant argues that the state presented no evidence identifying him as the perpetrator, that the evidence failed to show that appellant was at the Sunoco on the date and time of the incident, and that the evidence failed to show that appellant was in possession of a firearm. (Appellant's Brief at 8-9.) Appellant further asserts that the evidence was insufficient because, in the absence of any testimony of Ms. Stewart, there was no direct in-court identification of appellant as the perpetrator. None of these assertions has merit.

{¶ 28} It is well-settled that the state may establish the identity of a perpetrator by the use of direct or circumstantial evidence. *State v. Bias*, 10th Dist. No. 21AP-329, 2022-Ohio-4643, ¶ 36, citing *State v. Watkins*, 10th Dist. No. 14AP-807, 2016-Ohio-1029, ¶ 22, citing *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 18. "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." (Internal quotations and citation omitted.) *State v. Robinson*, 10th Dist. No. 17AP-5, 2018-Ohio-1809, ¶ 20, quoting *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has the same probative value as direct evidence. *Robinson* at ¶ 20, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990) (noting " '[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.' ").

{¶ 29} Here, the evidence presented at trial by the state included B.T.'s testimony that she heard gunshots in the Sunoco parking lot and observed an individual in a tan vehicle chasing another vehicle out of the parking lot immediately after she heard the gunshots. The Sunoco's surveillance cameras recorded this incident on video. Detective Cromwell testified that he observed shattered glass in the parking lot near the dumpsters and he collected a shell casing found in the same area. Mr. Melton's testimony, as well as the recording of the 911 call admitted into evidence as state's exhibit A, establish that after Ms. Stewart left the Sunoco parking lot after being shot, she was chased by her husband

(appellant) in a separate vehicle as she drove from Columbus to Whitehall until the point at which she encountered Officer Hicks at the intersection of Main Street and James Road. Ms. Stewart's statements reporting that appellant was chasing her during this time frame were supported by the photograph of appellant's vehicle captured by Whitehall's Flock surveillance camera No. 16, which was located only 5 blocks from the intersection where Ms. Stewart was found with two gunshot wounds.

{¶ 30} Furthermore, although Ms. Stewart did not testify at trial, multiple statements made by her identifying appellant as her assailant were admitted into evidence. Officer Hicks testified that Ms. Stewart identified appellant as the person who shot her in the immediate aftermath of the shooting. Ms. Stewart also identified appellant as the shooter in several statements she made during the course of her treatment both in the ambulance during transport to Mount Carmel East Hospital and at the hospital. These statements identifying appellant as the perpetrator were established via the testimony and reports of EMT Sarah Wagner, forensic nurse Angela Nelson, and forensic nurse Julie Foor. Notably, there was no evidence presented by the defense which identified another possible assailant.

{¶ 31} The foregoing evidence is entirely consistent with a jury finding that appellant was the perpetrator of the shooting against Ms. Stewart. Construing the evidence in favor of the state, we conclude it was sufficient to allow the jury to infer that appellant had committed felonious assault with a firearm beyond a reasonable doubt, as required by R.C. 2903.11. Thus, there was sufficient evidence to establish appellant's identity as the perpetrator of the charges against him, and the trial court properly overruled appellant's motions for acquittal made pursuant to Crim.R. 29.

{¶ 32} The manifest weight of the evidence also supports appellant's conviction for felonious assault with a firearm specification. As set forth above, under a manifest weight of the evidence analysis, although we are able to consider the credibility of the witnesses in conducting our review, "we are guided by the presumption that the jury * * * 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Cattledge* at ¶ 6, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 80. In this case, the jury was entirely free to believe the testimony of the witnesses presented by the state. *See Gullick* at ¶ 11. Indeed,

"the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Hood*, 10th Dist. No. 15AP-656, 2015-Ohio-5373, ¶ 11, citing *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 33} Moreover, "a prerequisite for any reversal on manifest-weight grounds is conflicting evidence." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 20 (court of appeals erred in reversing conviction based on manifest weight where evidence of perpetrator's identity was overwhelming). Here, there was no conflicting evidence as to the identity of the perpetrator. Instead, as noted above, appellant was the only person identified as the person responsible for shooting Ms. Stewart. And as we have already found, the state presented sufficient evidence to establish identity and all other elements of felonious assault beyond a reasonable doubt. Thus, in engaging in the limited weighing of the evidence which we are permitted, we cannot say the jury clearly lost its way when it found appellant guilty of felonious assault beyond a reasonable doubt. Accordingly, we find that the manifest weight of the evidence supports appellant's conviction.

{¶ 34} In sum, appellant has failed to demonstrate that the evidence was insufficient or that the jury clearly lost its way and created such a manifest miscarriage of justice that his conviction on the charge of felonious assault with a gun specification must be reversed and a new trial ordered. Because appellant's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence, his first and second assignments of error are overruled.

## IV. Disposition

{¶ 35} Having overruled both appellant's first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

MENTEL, P.J., and EDELSTEIN, J., concur.

———————